**RECORD NO. 15-1191**

In The

# United States Court Of Appeals
## For The Fourth Circuit

## THE ESTATE OF RONALD H. ARMSTRONG,
## by and through his Administratrix, Jinia Armstrong Lopez,

*Plaintiff – Appellant,*

v.

## THE VILLAGE OF PINEHURST;
## OFFICER JERRY MCDONALD, In his official and individual capacity; OFFICER TINA S. SHEPPARD, In her official and individual capacity; OFFICER ARTHUR LEE GATLING, JR., In his official and individual capacity,

*Defendants – Appellees,*

and

### TASER INTERNATIONAL, INC.,

*Defendant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO**

_____

## BRIEF OF APPELLEES
_____

**Dan M. Hartzog**
**Dan M. Hartzog, Jr.**
**CRANFILL, SUMNER**
**& HARTZOG, LLP**
**P. O. Box 27808**
**Raleigh, NC 27611**
**(919) 828-5100**

**Michael J. Newman**
**VAN CAMP MEACHAM**
**& NEWMAN, PLLC**
**P.O. BOX 1389**
**Pinehurst, NC 28370**
**(910) 295-2525**

*Counsel for Appellees*

*Counsel for Appellees*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street ♦ Suite 230 ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1191__      Caption: __Estate of Ronald Armstrong v. Village of Pinehurst, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Village of Pinehurst__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                             ☐ YES ☑ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent
     corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                                ☐ YES ☑ NO
     If yes, identify all such owners:

10/28/2013 SCC                                      - 1 -

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Dan M. Hartzog      Date:     3/5/2015

Counsel for: Defendants

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on     3/5/2015     the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

David J. Ventura/Crumley Roberts, Ste. 100
1051 East Morehead Street
Charlotte, NC 28204

Karonnie R. Truzy/Crumley Roberts, Ste. 200
2400 Freeman Mill Road
Greensboro, NC 27406

Michael J. Newman
Van Camp Meacham & Newman, PLLC
P.O. Box 1389
Pinehurst, NC 28370

/s/ Dan M. Hartzog            3/5/2015
(signature)              (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1191__       Caption: __Estate of Ronald Armstrong v. Village of Pinehurst, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Officer Jerry McDonald__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC                    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Dan M. Hartzog                          Date:        3/5/2015

Counsel for: Defendants

## CERTIFICATE OF SERVICE
**************************

I certify that on _____3/5/2015_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

David J. Ventura/Crumley Roberts, Ste. 100       Michael J. Newman
1051 East Morehead Street                         Van Camp Meacham & Newman, PLLC
Charlotte, NC  28204                              P.O. Box 1389
                                                  Pinehurst, NC  28370
Karronnie R. Truzy/Crumley Roberts, Ste. 200
2400 Freeman Mill Road
Greensboro, NC  27406

/s/ Dan M. Hartzog                                         3/5/2015
        (signature)                                         (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No.  15-1191          Caption:  Estate of Ronald Armstrong v. Village of Pinehurst, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Officer Tina S. Sheppard
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Dan M. Hartzog                    Date: ____3/5/2015____

Counsel for: Defendants

## CERTIFICATE OF SERVICE
****************************

I certify that on ____3/5/2015____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

David J. Ventura/Crumley Roberts, Ste. 100
1051 East Morehead Street
Charlotte, NC  28204

Karonnie R. Truzy/Crumley Roberts, Ste. 200
2400 Freeman Mill Road
Greensboro, NC  27406

Michael J. Newman
Van Camp Meacham & Newman, PLLC
P.O. Box 1389
Pinehurst, NC  28370

/s/ Dan M. Hartzog                              3/5/2015
_____              _____
        (signature)                                  (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1191__    Caption: __Estate of Ronald Armstrong v. Village of Pinehurst, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Officer Arthur Lee Gatling, Jr.__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC                              - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature:  /s/ Dan M. Hartzog          Date:  3/5/2015

Counsel for:  Defendants

## CERTIFICATE OF SERVICE
*****************************

I certify that on ____3/5/2015____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

David J. Ventura/Crumley Roberts, Ste. 100       Michael J. Newman
1051 East Morehead Street                        Van Camp Meacham & Newman, PLLC
Charlotte, NC  28204                             P.O. Box 1389
                                                 Pinehurst, NC  28370

Karonnie R. Truzy/Crumley Roberts, Ste. 200
2400 Freeman Mill Road
Greensboro, NC  27406

/s/ Dan M. Hartzog                               3/5/2015
_____                          _____
(signature)                                      (date)

# **TABLE OF CONTENTS**

Page:

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF THE CASE.................................................................1

    Statement of the Facts ....................................................................1

SUMMARY OF THE ARGUMENTS ...................................................19

ARGUMENT ........................................................................................21

    Standard of Review.......................................................................21

    Discussion of the Issues................................................................21

I.    PLAINTIFF HAS ABANDONED ALL CLAIMS EXCEPT FOR THE ISSUE OF QUALIFIED IMMUNITY BY FAILING TO ADDRESS THE RELEVANT ISSUES IN THE OPENING BRIEF...............................................................................21

II.    THE DISTRICT COURT DID NOT ERR IN GRANTING DEFENDANTS MOTION FOR SUMMARY JUDGMENT AS APPELLANT CANNOT ESTABLISH THAT ARMSTRONG'S CONSTITUTIONAL RIGHTS WERE VIOLATED...........................................................................22

    A.    An analysis of the *Graham* factors establishes that the Officers' use of force in this case was reasonable ...................23

        1.    The severity of the crime at issue ...................................24

        2.    Whether the suspect poses a threat to the safety of the officers or others .......................................................25

i

3.     Whether the suspect is actively resisting arrest or attempting to evade arrest by flight ................................27

B.    The Officers' use of force was reasonable under the circumstances ..........................................................................29

1.     The officers were under no obligation to continue attempting to verbally persuade Armstrong to come with them voluntarily.......................................................30

2.     The officers were entitled to use physical force in their efforts to take Armstrong into custody..................31

3.     The officers were entitled to use a taser in order to take Armstrong into custody...........................................33

4.     The officers were not required to treat Armstrong any differently due to his mental condition ...................37

III.   EVEN IF APPELLANT COULD ESTABLISH THAT ARMSTRONG'S CONSTITUTIONAL RIGHTS WERE VIOLATED, THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY, AS THOSE RIGHTS WERE NOT CLEARLY ESTABLISHED AT THE TIME.....................................38

IV.   TO THE EXTENT APPELLANT HAS NOT WAIVED CLAIMS FOR MUNICIPAL LIABILITY UNDER § 1983, THE DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT AS TO THOSE CLAIMS ......................45

CONCLUSION ....................................................................................48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ii

# TABLE OF AUTHORITIES

Page:

## CASES:

*A Helping Hand, LLC v. Baltimore County,*
  515 F.3d 356 (4th Cir. 2008) .........................................................................21

*Abdullahi v. Madison,*
  423 F.3d 763 (7th Cir. 2005) .........................................................................32

*Bailey v. Kennedy,*
  349 F.3d 731 (4th Cir. 2003) ...............................................................*passim*

*Bell v. Dawson,*
  144 F. Supp. 2d 454 (W.D.N.C. 2001)...................................................31, 32

*Bornstad v. Honey Brook Twp.,*
  211 Fed. App'x 118 (3d Cir. 2007)................................................................42

*Brown v. Gilmore,*
  278 F.3d 362 (4th Cir. 2002) .........................................................................31

*City of Canton v. Harris,*
  489 U.S. 378 (1989)........................................................................................45

*Drewitt v. Pratt,*
  999 F.2d 774 (4th Cir. 1994) .........................................................................21

*Drummond v. City of Anaheim,*
  343 F.3d 1052 (9th Cir. 2003) .......................................................................42

*Dunbar Corp. v. Lindsey,*
  905 F.2d 754 (4th Cir. 1990) .........................................................................23

*Elliott v. Leavitt,*
  99 F.3d 640 (4th Cir. 1996) ...........................................................................23

*Estate of Awkward v. Willingboro Police Dep't*,
    Civ. Action No. 07-5083,
    2010 WL 3906785 (D.N.J. 2010) ................................................................41

*Graham v. Connor*,
    490 U.S. 386 (1989)...........................................................19, 23, 24, 41

*Hagans v. Franklin County Sheriff's Office*,
    695 F.3d 505 (6th Cir. 2012) ........................................................40

*Higgins v. E. I. Dupont de Nemours & Co.*,
    863 F.2d 1162 (4th Cir. 1988) ....................................................21

*Love-Lane v. Martin*,
    355 F.3d 766 (4th Cir. 2004) ......................................................45

*Meyers v. Baltimore Cnty., Md.*,
    713 F.3d 723 (4th Cir. 2013) ...........................................34, 43, 44

*Myrick v. Cooley*,
    91 N.C. App. 209, 371 S.E.2d 492 (1988) ..................................35

*Phillips v. Milwaukee*,
    123 F.3d 586 (7th Cir. 1997) ...............................................32, 33

*Russell v. Wright*,
    916 F. Supp. 2d 629 (W.D. Va. 2013).........................................39

*Sigman v. Town of Chapel Hill*,
    161 F.3d 782 (4th Cir. 1998) ...............................................24, 31

*Slattery v. Rizzo*,
    939 F.2d 213 (4th Cir. 1991) ......................................................22

*Spell v. McDaniel*,
    824 F.2d 1380 (4th Cir. 1987) ....................................................45

*Thomas v. Holly*,
    533 Fed.Appx. 208 (4th Cir. 2013) .............................................35

*United States v. Al–Hamdi,*
    356 F.3d 564 (4th Cir. 2004) ...........................................................21

*Wellington v. Daniels*,
    717 F.2d 932 (4th Cir. 1983) ......................................................45, 46

*Willingham v. Crooke*,
    412 F.3d 553 (4th Cir. 2005) ...........................................................23

*Witt v. West Virginia State Police*,
    633 F.3d 272 (4th Cir. 2011) ...........................................................38

*Yousefi v. INS,*
    260 F.3d 318 (4th Cir. 2001) ...........................................................21

## STATUTES:

42 U.S.C. § 1983 ......................................................................*passim*

N.C. Gen. Stat. § 122C-251 ...............................................................24

N.C. Gen. Stat. § 122C-251(e) ......................................................*passim*

N.C. Gen. Stat. § 122C-262 ...............................................................24

N.C. Gen. Stat. § 122C-263 .....................................................20, 24, 30

## CONSTITUTIONAL PROVISIONS:

N.C. Const., Art. I § 1 .....................................................................21

N.C. Const., Art. I § 19 ...................................................................21

## STATEMENT OF THE CASE

On 13 April 2013, Jinia Lopez ("Plaintiff" or "Lopez") filed this action on behalf of the Estate of Ronald Armstrong (Armstrong"). (JA 12). Plaintiff alleges that Gatling, McDonald, and Sheppard ("the Officers"), who were employed as police officers with the Village of Pinehurst ("Pinehurst"), used excessive force while attempting to execute involuntary commitment papers on Armstrong on 23 April 2011. Plaintiff's complaint asserts the following claims: (1) a federal excessive force claim against the Officers in their individual capacity pursuant to 42 U.S.C. § 1983, (2) a municipal failure to train claim against Pinehurst and its officials pursuant to § 1983, (3) a state wrongful death claim based upon negligence and gross negligence, and (4) a state constitutional claim. (JA 12-26).

On 29 October 2014, Defendants filed a Motion for Summary Judgment as to all claims. (JA 173). A hearing was held on 21 January 2015 before the Judge Catherine C. Eagles, and on 27 January 2015, Defendants' Motion for Summary Judgment was granted. (JA 765). Plaintiffs filed a Notice of Appeal on 24 February 2015. (JA 770).

## Statement of the Facts

On 23 April 2011, Jinia Lopez ("Lopez") brought her brother Ronald Armstrong ("Armstrong") to FirstHealth Regional Hospital ("Hospital") in the

1813166v1

Village of Pinehurst for treatment. Armstrong, who was bipolar and a paranoid schizophrenic, had been off his medications for days and had been hallucinating and hurting himself. (JA 210-214, 216). The prior day, he had poked his leg with an icepick causing open wounds in order to "let the air out." (JA 209, 210, 213-214). Armstrong did not want to go to the hospital and talked with Lopez about running away. (JA 215, 217). At the hospital, Armstrong was assessed by Dr. Jeffrey Gibbons who ordered lab work and medication (which was never administered) to stabilize Armstrong. (JA 249-250, 253, 255-258). In the treatment room, Armstrong refused to let the lab tech draw blood.  He jerked away, pulled the IV from his arm, and left the room. (JA 217-218). The lab tech reported that she felt threatened by Armstrong. (JA 257-258). Based on his assessment, Gibbons determined that Armstrong needed to be involuntarily committed for treatment. (JA 261, 269, 675). Gibbons believed that Armstrong was a danger to himself and needed to be committed emergently, "meaning right now." (JA 261-262, 267). Gibbons testified that Armstrong's psychiatric condition was "active" when he left the hospital. (JA 265-266).

Upon learning of the situation, Hospital Security Guard Johnny Verbal ("Verbal") responded and observed Armstrong and Lopez arguing, which he described as an altercation. (JA 275, 312). Verbal testified that Armstrong "took

- 2 -

off' when he saw him, and that he and Lopez followed Armstrong off the hospital premises. (JA276, 278-282). Lopez testified that Armstrong had been talking about running away from the hospital, and that "all of a sudden he just got belligerent and walked out." (JA 217). It was clear that Armstrong was trying to get away from them. (JA 314). Lopez and Verbal followed Armstrong to an intersection at the main front entrance of the hospital where they observed Armstrong standing in the street. (JA 273). They pleaded with him to return to the hospital but he refused. (JA 283-284).

Master Patrol Officer Lee Gatling ("Gatling") testified that the police department received a call from dispatch, around 6:45 p.m., wherein it was reported that the hospital needed assistance with a patient walk-off. (JA 395-396). When Gatling arrived at the scene, Armstrong was still standing in the street. (JA 405). Armstrong was walking into traffic, and cars were having to slow down. *Id.* After being asked several times by Gatling to get out of the street, Armstrong eventually moved to a grassy area near the curb. *Id.*

Several minutes later, Sergeant Tina Sheppard ("Sheppard") arrived, having been asked by hospital security to go help with the situation. (JA 503).[1] By this

---

[1] Sheppard activated her camera system after arriving at the scene. Due to the positioning of her car, the recording captured audio only. (JA 471-473). The recording is included as Volume III of the Joint Appendix.

time, Armstrong was engaging in self-destructive behavior, such as eating grass, dandelions, and gauze, as well as burning his arms and tongue with cigarettes. (JA 178-179, 449, 507-508). Lopez acknowledged that, at this point, Armstrong was a danger to himself and was hurting himself. (JA 178). Lopez acknowledged that she did not want the Officers to leave and agreed they were there to help. (JA 223).

Everyone continued to plead with Armstrong to return to the hospital. (JA 223, 286, 291, 295, 316-317). Sheppard attempted to establish a rapport with Armstrong by talking to him about the foods he liked to eat, and how they could get him some brussel sprouts and other food he liked at the hospital. (JA 224). Sheppard testified that, "I was trying to distract him and, you know, be his friend." (JA 508). Sheppard told Armstrong a story of how her mother caught her smoking when she was little and made her eat the cigarette, in an effort to get him to put down the cigarette that he was burning himself with. (JA 508). Other Officers tried to talk to Armstrong about how he would be able to watch television and listen to music at the hospital. (JA 225). Lopez agreed that the officers made an effort to get Armstrong to cooperate, but that they were unable to do so. (JA 225).

Wayne Morton, a nurse from the hospital, came to the scene and also tried to convince Armstrong to return, but was likewise unable to do so. (JA 292). Morton advised the Officers that he was going initiate commitment papers to bring

Armstrong back to the hospital. *Id.* Lopez knew that Armstrong might run, and was concerned that he was going to do so when he heard about the commitment papers. (JA 226). Lopez told Morton that Armstrong was going to run when he heard about the papers. (JA 509). Security Guards Verbal and Jack Blankenship ("Blankenship"), who had arrived at the scene by this time, testified that it was clear at all times during the encounter that Armstrong was not going to return to the hospital voluntarily. (JA 317, 349).

About ten minutes after Gatling and Sheppard had arrived on the scene, Lt. Jerry McDonald ("McDonald") arrived. (JA 407). McDonald was getting ready to clear the Officers from the scene, as the commitment paperwork had not yet been signed and security guards were present. (JA 530-532). Prior to arriving, all McDonald knew was that there had been a patient walk-off from the hospital, and that there was no paperwork for an involuntary commitment yet. (JA 531-532). However, shortly after McDonald arrived on the scene, dispatch reported that the involuntary commitment papers had been signed and notarized. (JA 532). At this time, the Officers discussed their options given Armstrong's refusal to return to the hospital. McDonald indicated that tasing Armstrong was an option, but no one got their tasers out at this time or made a definite plan to tase him. (JA 469). Everyone, including Lopez and the security guards, testified that the Officers had not touched

- 5 -

Armstrong prior to this time. They had just informed him that he needed to go with them and moved toward him. (JA 227, 318, 331, 346, 348; 541).

When Armstrong learned the papers had been signed, his demeanor drastically and immediately changed. McDonald testified that it was "like a light went off," and that, "when we told him we had the paperwork and he had to go, he was agitated. You could tell he was tensing up right then." (JA 538, 561). Gatling testified that Armstrong "flipped," and that, "as soon as he found out, you know, that we had the papers, he instantly changed. He became extremely agitated and irritated because he didn't want to go and seek treatment." (JA 427). Sheppard testified that Armstrong "went totally ballistic and combative" upon learning of the commitment order. (JA 512).

Upon being told that he had to return to the hospital, Armstrong immediately walked away from the Officers, dropped to the ground, and wrapped his arms and legs around a sign post located a few feet from the intersection. Blankenship testified that, "when they told him they were going to have to take him in, they went to grab him by the arms, and he just started fighting against them and worked his way—there was a—a four by four post that holds the sign up on the corner here, and he wrapped his two legs and his two arms around it and they were attempting to get his arms and legs loose from the pole." (JA 330). Verbal testified

- 6 -

that, "they informed him that he must go back to the hospital for treatment and stuff and they approached him. As they approached and got closer, he turned around and walked towards the sign. They followed him, and all of a sudden he just dropped to the ground…He grabbed hold of the post, surrounded the post with his foot and leg." (JA 300). Sheppard testified that, "I just remember right after they said he was going to be involuntarily committed, he just went down to the pole and grabbed it and was hanging on." (JA 228). McDonald testified that, "we tried to calm him down. We tried to make him understand, and you have to understand, it was, it was just a second or so before he reached around that pole and it was, it was over with. He would not listen. As soon as he was told that, he grabbed that pole, legs crossed, and hung on." (JA 541). Lopez testified that, "I just remember right after they said he was going to be involuntarily committed, he just went down to the pole and grabbed it and was hanging on." (JA 228).

The Officers initially tried to use verbal commands to convince Armstrong to let go. (JA 541). Sheppard testified that, "we were pleading with him to let go of the pole. Let go, please let go of the pole." (JA 485). McDonald testified that, "I verbally told him please release, please take your hands off the pole, you know, we got to go to the hospital." (JA 542). Gatling also attempted to talk Armstrong into going back in voluntarily, to no avail. (JA 450). Verbal testified that, "they kept pleading with—

- 7 -

pleading with Mr. Armstrong to let go of the pole, let go of the pole." (JA 302). Armstrong would not comply, and was telling the Officers that he was not going back to the hospital, despite the commitment order. (JA 301, 349, 450).

After it became clear that verbal commands were not going to work, the Officers escalated to "soft hands" which meant trying to physically pull Armstrong from the pole. (JA 301, 451, 486). However, Armstrong was holding onto the post tightly with both legs and both arms and would not let go. (JA 228, 300-301, 330, 538). Sheppard testified that Armstrong "was wrapped around the pole with all his might seated with his legs wrapped as tight as possible, his arms wrapped as tight as possible. Nobody could pry his arms or legs from that pole." (JA 487). Gatling testified that Armstrong was physically struggling to prevent the officers from placing handcuffs on him, and that he "had to struggle enough to resist from at least three people so it was pretty strong." (JA 452). Gatling characterized Armstrong's resistance as "active resistance." *Id.* McDonald characterized Armstrong's resistance as "active aggression" due to the fact that, "when we tried to pull his hand away, he pulled, he pulled back." (JA 542). McDonald testified that, "when he pulled his arm away from it and he reaches back around it and hold on, to me that's active aggression…he's resisting or fighting, whatever term you want to use that he's not going to cooperate." *Id.* Lopez agreed that the Officers

- 8 -

tried to pull Armstrong off the pole, but could not because he was resisting. (JA 230-231). Lopez was repeatedly and loudly pleading with Armstrong to "quit fighting!" with the Officers. (JA 231). Lopez yelled at her brother at least six (6) times to "quit fighting!" and "stop fighting," and pleaded with him to "let it go!" at least ten (10) times. (JA Volume III). Lopez's efforts had no effect, as Armstrong continued to resist. *Id.*

Despite their efforts, the Officers were not able to physically loosen Armstrong's grip on the post. (JA 301, 349, 451-452). Sheppard recalled that Armstrong had "wrapped himself so tightly around that pole that you couldn't get anything between him and the—there was nothing—no way you put anything between him and the pole. And also, he legs were wrapped around the pole in the same manner and he was just hugging and grasping that pole with all this might so that we could not get him off of it or take him to the hospital." (JA 512). McDonald testified that, "He—you have to understand, he is, he was a very strong man, very strong. We tried, each one of us, I was on one side. The other officers were on the other side. We were trying to pry his arms because he had it wrapped and had to pry his hands loose." (JA 544). Everyone agreed that Armstrong (estimated to be 5' 9" and 260 pounds) was extremely strong. (JA 297-298, 329, 481, 552). Lopez testified that, "when bipolar people get mad, they get strong." (JA 234).

- 9 -

When it became clear that both verbal commands and manually prying Armstrong from the pole were not going to work, McDonald told Gatling to take out his taser. (JA 421). McDonald testified that, prior to using the taser, they had "tried to talk to him, reason with him. Tried to put his arm up, you know, when he wouldn't listen, tried to pull him away and nothing, nothing would work." (JA 565). Prior to deploying the taser, Gatling warned Armstrong that they were going to tase him if he did not let go of the pole. (JA 435, 495). The purpose of warning Armstrong was to try once again to get him to comply. (JA 435). Verbal testified that, "they advised him that if he didn't turn the pole loose, that he was going to tase him." (JA 302-303). Blankenship testified that, "Officer Gatling instructed him if he didn't turn loose, he was gonna tase him, but he still would not comply." (JA 333). Likewise, Lopez testified as follows:

> Q:    So he resisted them trying to get him off of the pole and they
>       told him if you don't let go, we're going to have to tase you?
>
> A:    Yes, sir.

(JA 231). McDonald advised Gatling to tase Armstrong in the drive stun mode, as he did not believe it was necessary to use the prongs.  (JA 547).

The data unloaded from Gatling's taser reveals that the taser was deployed—meaning the trigger was pulled—five times. It is unclear, however, if the taser actually made contact with Armstrong five times. McDonald testified that they

- 10 -

generally do a "spark test," which involves pulling the trigger to make sure the taser is working correctly. (JA 567). This would have been done before the taser was used on Armstrong, and may have been done again after the third tasing to make sure it had been working, given that it appeared to have no effect on him. *Id.* Gatling recalls making three attempts to use the taser on Armstrong, each in drive stun mode. (JA 423-426). Lopez testified that she believed it was used on Armstrong more than three times, but did not recall exactly how many times it was used. (JA 242).

After each drive stun, it was apparent that the taser did not have any effect, as Armstrong continued holding onto the pole and resisting. Gatling testified that Armstrong "didn't respond" to the taser, and continued to grip the pole with both his legs and his arms. (JA 424-425). Sheppard testified that Armstrong did not respond to the taser, and even looked at her and told her it didn't hurt. (JA 482). McDonald testified that it seemed Armstrong actually had a firmer grip on the pole after they had used the taser. (JA 550). Verbal testified that, "it didn't have an effect on him." (JA 302). At some point, Verbal saw Armstrong knock the taser out of Gatling's hand before grabbing back onto the pole. (JA 321). Lopez testified as follows:

> Q:     And after he was tased, he didn't just come off of the pole, did he?
>
> A:     No, sir.

Q:    So even after he was tased, he was still hanging onto that pole with all his might?

A:    Yes, sir.

(JA 232).

When it became clear that the taser was not effective, McDonald instructed Gatling to put the taser away. (JA 565). McDonald testified that, "I saw that it wasn't having any effect on him and he actually seemed to get stronger by grabbing onto the pole. So I knew then, the taser was not going to work in my experience. So it was going to have to be hands on hands." *Id.*

Gatling put his taser away, and the Officers went back to physically trying to pry Armstrong from the post. (JA 543, 550). By this point, one of the security guards was helping as well. *Id.* While the Officers were attempting to pull Armstrong from the pole, he continued to resist. (JA 321-322). Blankenship testified that Armstrong "continued to kick around and refused to let go of the pole" even after the taser was put away. (JA 353-354). Despite Armstrong's continued resistance, the officers were eventually able to loosen his grip and get him off the post by continuing to pull on his arms. (JA 432). Gatling testified that, "it was a huge struggle to get him off the pole." (JA 453). McDonald testified that it took "several minutes" of pulling on Armstrong's arms to pull him away from the pole. (JA 566).

- 12 -

Once the Officers got Armstrong loose from the pole, they attempted to put handcuffs on him. As the Officers attempted to place handcuffs and leg shackles on Armstrong, he continued to resist. McDonald testified that Armstrong "became violent," and "kicked at us when we tried to put the handcuffs on his legs." (JA 573). Blankenship testified as follows:

Q:    Okay. So even after they got him from the pole was he still trying not to be handcuffed?

A:    Yes, ma'am.

Q:    And can you describe how he was still not trying to be handcuffed?

A:    He was trying to keep his arms in front of him.

Q:    Okay. And were they telling him to put his hands behind his back?

A:    Yes, ma'am.

Q:    And were they trying to actually get his hands behind his back?

A:    Yes, ma'am.
Q:    And he was not complying with those orders?

A:    That's correct.

Q:    And I believe you testified that he was kicking his legs?

A:    Yes, ma'am.

…

Q:     Can you describe what you mean by he was kicking his legs?

A:     He was just kicking his legs and Officer Sheppard was attempting to hold his legs down, and when she tried to use the shackles, she couldn't use both hands and keep his legs down so that's when I assisted her with holding his legs down.

(JA 350-351).

Sheppard was finally able to get Armstrong's legs shackled, but he continued to resist the application of handcuffs. (JA 491, 543). At this point, Armstrong was "lying on his arms and hands trying to keep us from putting handcuffs on him." (JA 490). Blankenship testified that the Officers "attempted to handcuff him and they were unable to. He was just struggling against them…they instructed Mr. Armstrong to put his hands behind his back and several times and he wouldn't do it." (JA 336-337). McDonald testified that, "he was still resisting. We did get one handcuff on. He was still resisting trying to put the other arm—finally got it pried away from the pole and tried to put the one handcuff on. We finally got it on. We got a second pair of handcuffs because he was such a big man, strong. Got him turned over. And finally got the two handcuffs put together." (JA 543-544). Lopez testified that Armstrong was "forcefully resisting" as the Officers tried to place handcuffs on him, and conceded that Armstrong was "actively trying not to be cuffed." (JA 233-235). Lopez herself had to press her foot down on Armstrong's leg in an attempt to help the officers get his legs cuffed. (JA 233).

- 14 -

Lopez testified that Sheppard stood on Armstrong's back in order to help the other Officers get him handcuffed. (JA 236). She does not recall how long but stated it was just enough to handcuff him. (JA 239).[2]

In order to complete the handcuffing process, McDonald briefly—for just a few seconds—placed one knee on Armstrong's back near the shoulder blades in order to keep him from getting up while they were placing handcuffs on him. (JA 553, 570). McDonald testified that "there was not much pressure there. He was actually lifting up my knee." (JA 558). McDonald testified that his weight was on his other leg; not on Armstrong's back. (JA 558-559). While he did so, Armstrong continued to move around. *Id.* The security guards never saw anyone put a knee on Armstrong's back (or stand on his back) for any prolonged period of time. (JA 324-325, 354).

Once Armstrong was handcuffed, the Officers stood up to catch their breath and make sure everyone was okay. (JA 554). No one used any force on Armstrong after he was handcuffed. (JA 323). Lopez testified that the Officers were "trying to catch their breath." (JA 240). Blankenship testified that both he and the Officers were "winded and tired" from the efforts to handcuff Armstrong. (JA 338). Gatling

---

[2] No other witnesses recall Sheppard standing on top of Armstrong, and Lopez' recollection appears to be inconsistent with the testimony that Sheppard was trying to place shackles on Armstrong's legs rather than handcuffs on his hands.

- 15 -

testified that the Officers needed to catch their breath after been involved in the altercation with Armstrong. (JA 446). Sheppard testified that she "had a lot of pressure in [her] chest and was having a hard time breathing." (JA 520). In fact, she ultimately had to seek medical treatment as a result. (JA 476).

As the Officers were making sure everyone was okay, Lopez voiced concerns that Armstrong was not moving. (JA 493). Lopez testified that the Officers *immediately* rolled Armstrong onto his back. (JA 241). Armstrong had been lying prone on his stomach for seconds only. (JA 355, 493). Gatling estimated the length of time as fifteen to twenty seconds. (JA 446). Blankenship described it as "just a couple of seconds." (JA 346). When interviewed by the SBI, Verbal reported that Armstrong was lying prone for just seconds. (JA 746). Armstrong's face was to the side (not face down) when the Officers finally handcuffed him. (JA 310, 324, 517).

Upon determining that Armstrong was in distress, the Officers immediately began performing CPR and EMS was called. (JA 554-555). Armstrong was transported to the hospital where he was pronounced dead. Dr. Christopher Gulledge, who performed Armstrong's autopsy, determined the cause of death to be complications of excited delirium syndrome. (JA 756). He also diagnosed an underlying heart condition -- cardiomegaly. (JA 600). While plaintiff's experts

- 16 -

contend that Armstrong's death was caused by a combination of cardiac tissue damage from the taser and positional asphyxia, Gulledge testified that he looked for signs of positional asphyxia during Armstrong's autopsy and did not find any. (JA 603-605). Lopez testified that she never observed Armstrong have any trouble breathing until after he was handcuffed, and she informed the officers that he was not moving. (JA 237, 240-241). All of the other witnesses confirmed that Armstrong had no apparent breathing issues during the course of the encounter. (JA 314-315, 324, 351, 454, 464, 517, 559). Lopez testified that Armstrong was moving around at all times until the Officers stood up, and that she was able to see that he was breathing when the Officers were attempting to handcuff him.  (JA 239-240).

Defense expert Dr. Gary Vilke (who has extensive expertise in excited delirium and positional asphyxia) agreed with Dr. Gulledge's findings, including his finding that positional asphyxia did not occur, and that "Mr. Armstrong was suffering from signs and symptoms of excited delirium syndrome and was the likley cause of his cardiac arrest, with his underlying cardiomyopathy as a contributing factor." (JA 626-627). Vilke has participated in studies which support his opinion that the positioning and weight and pressure allegedly exerted on Armstrong's back could not have caused asphyxia. (JA 608-613, 615, 625-627).

- 17 -

Vilke also testified that there is no credible medical literature establishing a link between the use of a taser in drive stun mode and death. (JA 617-624). Vilke testified that, "the drive stun mode is a pain compliance mode. It causes local discomfort and pain. It does not impact the heart. It does not impact physiology. It doesn't cause death." (JA 625). Plaintiff's own expert, Mel Tucker, agreed that a taser in drive stun mode is non-lethal use of force technique that can be used to overcome resistance. (JA 637, 650).

No evidence exists of prior incidents or complaints of excessive force involving the Officers. The Department has had only *seven* incidents involving force of any kind since 2007 (not including Armstrong's incident). None of these incidents resulted in significant injuries or claims. (JA 182, ¶¶ 11-12). From 2006 to the date of Armstrong's incident, the Department responded to 456 mental health calls (which would include involuntary commitments calls). (JA 182, ¶ 10). Force was used in only *four* of these calls. Tasers were used in only two of these mental health calls. (JA 182, ¶¶ 12-13). Only *five* individuals, including Armstrong, have been tased by any Pinehurst officer at any time since tasers were obtained by the Department in 2006. (JA 182, ¶12).

The Department's training is summarized in Deputy Chief Thomas' Affidavit (JA 182). At all relevant times, the Department's training program met or

exceeded the training required by the State's Criminal Justice Education and Training Standards Commission. (JA 182, ¶¶ 5-8). The Department also sends its officers to a one week course involving mental health issues. (JA 182, ¶ 8). The defendant Officers were in compliance with and had successfully completed all state mandated training, as well as any additional training required by the Department, during the relevant time period.  They were also certified to use tasers.  (JA 182, ¶ 4).

## SUMMARY OF THE ARGUMENTS

Summary judgment should be affirmed in the defendants favor as to all of plaintiff's claims in this case. As Plaintiff has failed to address any claim other than her § 1983 excessive force claim in her opening brief, she has waived her appeal with respect to these claims.

With regard to the § 1983 excessive force claim, questions of material fact do not exist and the Record establishes that defendants are entitled to prevail as a matter of law. In this case, no evidence exists that Mr. Armstrong's constitutional rights were violated. Despite Appellant's conclusory assertion that the Officers could have utilized "demonstrably more reasonable levels of force," an analysis of the three factors set out in *Graham v. Connor*, 490 U.S. 386 (1989) establishes the Officers used reasonable force under the circumstances. It is undisputed that the

Officers were required to take Armstrong into custody once the commitment papers were executed pursuant to N.C. Gen. Stat. § 122C-263. The Officers were also entitled to use physical force pursuant to N.C. Gen. Stat. § 122C-251(e), including a taser in order to take Armstrong into custody.

In addition, the Officers are entitled to qualified immunity as there is no evidence that the Officers violated any constitutional rights which were clearly established at the time of the incident on 23 April 2011. Since this incident, the courts have approved multiple uses of a taser on suspects who are actively resisting, and the Record evidence makes clear that Armstrong was actively resisting the Officers from the time he grabbed the post until he was handcuffed, both before and after the taser deployments.

Finally, the District Court did not err in granting summary judgment as to Appellant's municipal liability claim under § 1983, as no evidence exists of any official policy or custom involving the use of excessive force, and no evidence exists of deliberately indifferent training or supervision by Pinehurst or its officials.

## **ARGUMENT**

### **Standard of Review**

On appeal, the District Court's granting of summary of judgment is reviewed *de novo*. *Drewitt v. Pratt*, 999 F.2d 774, 778 (4th Cir. 1994); *Higgins v. E. I. Dupont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988).

### **Discussion of the Issues**

**I.    PLAINTIFF HAS ABANDONED ALL CLAIMS EXCEPT FOR THE ISSUE OF QUALIFIED IMMUNITY BY FAILING TO ADDRESS THE RELEVANT ISSUES IN THE OPENING BRIEF.**

"It is a well settled rule that contentions not raised in the argument section of the *opening brief* are abandoned." *A Helping Hand, LLC v. Baltimore County,* 515 F.3d 356, 369 (4th Cir. 2008) (*quoting United States v. Al–Hamdi,* 356 F.3d 564, 571 n. 8 (4th Cir. 2004)). An appellant cannot remedy the situation by raising the issue in his reply brief. *See Yousefi v. INS,* 260 F.3d 318, 326 (4th Cir. 2001) (per curiam). Appellant's brief contains no argument as to their causes of action for Negligence, Gross Negligence, and Wrongful Death (First Claim for Relief), Deprivation of Life Outside the Law of the Land, N.C. Const., Art. I §§ 1, 19 (Third Claim for Relief), Action Pursuant to 42 U.S.C. § 1983 as against Defendant The Village of Pinehurst: Failure to Properly Train (Fourth Claim for

Relief). (JA 12-26). As a result, these claims are deemed abandoned, leaving for this Court's consideration only the § 1983 excessive force claim.

With regard to the § 1983 claims against the Village of Pinehurst, the District Court recognized that, "the plaintiffs have produced no evidence of an unconstitutional policy or custom, and it is not enough that officers did not receive annual training on the use of tasers." (JA 768). Appellant's opening brief contains no argument or discussion of this ruling, and therefore the claims against the Village of Pinehurst are deemed abandoned.

As Plaintiff's brief does not address any of the relevant legal claims except for the issue of qualified immunity, she has abandoned all claims except for the individual capacity claims against the Officers.

## II.    THE DISTRICT COURT DID NOT ERR IN GRANTING DEFENDANTS MOTION FOR SUMMARY JUDGMENT AS APPELLANT CANNOT ESTABLISH THAT ARMSTRONG'S CONSTITUTIONAL RIGHTS WERE VIOLATED.

"A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991). The purpose of qualified immunity is to "remove most civil liability actions, except those where the official clearly broke the law . . . ." *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."

- 22 -

*Dunbar Corp. v. Lindsey*, 905 F.2d 754, 763 (4th Cir. 1990). Qualified immunity

involves two questions:  (1) whether the evidence establishes the violation of a

constitutional right; and (2) whether the right was "clearly established" at the time

of the events at issue.  *Id.*  In *Willingham v. Crooke*, 412 F.3d 553, 559-560 (4th

Cir. 2005), the Court ruled that while unresolved factual issues are to be resolved

by the jury, the question of whether qualified immunity precludes liability is for

the Court. *Id.*

### A.    An analysis of the *Graham* factors establishes that the Officers' use of force in this case was reasonable.

In assessing claims of excessive force under the Fourth Amendment, the

court must apply a standard of "objective reasonableness." *Graham v. Connor,* 490

U.S. 386, 395 (1989). Specifically, the court must determine "whether a reasonable

officer in the same circumstances would have concluded that a threat existed

justifying the particular use of force." *Elliott v. Leavitt,* 99 F.3d 640, 642 (4th Cir.

1996) (*citing Graham,* 490 U.S. at 396–97). This fact-intensive balancing test must

be applied in light of the fact that "police officers are often forced to make split-

second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation."

*Graham,* 490 U.S. at 397. To assist courts with this task, the Supreme Court

offered three factors for courts to consider when determining whether a given use

of force was excessive: (1) the "severity of the crime at issue," (2) whether the suspect posed an "immediate threat to the safety of the officers or others," and (3) whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. This evaluation is guided by the pragmatic, considerations of the moment and not by those that can be hypothesized from an armchair. *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786-87 (4th Cir. 1998). Thus, "the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (*citing Graham*, 490 U.S. at 396-97).

As Plaintiff concedes, the material facts of this case are largely undisputed. (Appellant's Brief, p. 2). An analysis of the three Graham factors establishes that the Officers used reasonable force under the circumstances.

### 1.    The severity of the crime at issue.

With regard to the first prong, while Plaintiff had not committed any crime, it is undisputed that the officers were required to take Armstrong into custody and transport him to the hospital based on the involuntary commitment orders. N.C. Gen. Stat. §§ 122C-251 and 262 provide that a physician's certificate serves as a custody order, and N.C. Gen. Stat. § 122C-263 provides that the officer "shall" transfer the respondent to a treatment facility "without unnecessary delay." In her

brief, Plaintiff concedes that she "does not contest the authority of the officers to make an arrest in the present case." (Appellant's Brief p. 17). Moreover, the officers were statutorily entitled to use reasonable force to take Armstrong into custody. N.C. Gen. Stat. § 122C-251(e) authorizes an officer to use reasonable force where necessary when transporting someone pursuant to an involuntary commitment order. Appellant concedes that the Officers, "were not constitutionally limited to attempting to verbally persuade Armstrong." (Appellant's Brief, p. 21). As such, this case is distinguishable from those in which the Courts have heavily weighed the fact that the plaintiff had not committed a crime, as there is no question here that the Officers were statutorily required to take Armstrong into custody, and statutorily authorized to use reasonable force if necessary to do so.

> **2.    Whether the suspect poses a threat to the safety of the officers or others.**

It is undisputed that Armstrong posed a danger to himself. The involuntary commitment orders stated that Armstrong was "mentally ill and a danger to himself." (JA 675). The order stated as follows:

> "Ronald Armstrong is a 43-year-old single Caucasian male from Robbins who is brought to ED by his sister because of a psychotic decompensation of his chronic mental illness. HOPI: Multiple admissions, followed by the ACT Team. He has been off his antipsychotic medication for about five days. He has been cutting himself, "to let the air out." During the course of the evaluation he apparently became frightened and eloped from the ED. Given his

impaired judgment, insight, and impulse control, I have elected to emergently commit him for his safety."

(JA 675). Dr. Gibbons testified "emergently" meant that Armstrong needed to be taken into the hospital on an emergency basis, as in "now" or "right this minute." (JA 261-262).

Everyone present agreed that Armstrong was engaging in self-destructive behavior, such as eating grass, dandelions, and gauze, as well as burning his arms and tongue with a cigarette. (JA 219-220, 449, 507-508). Lopez acknowledged that, at this point, Armstrong was a danger to himself and was hurting himself. (JA 220). Lopez agreed that there was "an immediate need" for Armstrong to be taken to the hospital. (JA 226). The post Armstrong was clinging to was very close to the street, as shown in the photograph attached to Lopez's deposition. (JA 674). Traffic increased as the incident unfolded and people started to gather in the area. (JA 288, 298, 309, 326). There can be no dispute that this was not a safe place to leave someone in Armstrong's condition. Sheppard testified that, "we were in an intersection, it was very dangerous. There were cars going by that were going at a fast rate of speed." (JA 461).

Further, while the Officers did not see any weapons on Armstrong, the officers did not have an opportunity to frisk Armstrong prior to the time he grabbed the post. (JA 464). In addition, the Officers' weapons were exposed during

- 26 -

the struggle, and, as Sgt. Ray Evans testified, many officers have been killed by their own weapons during a physical struggle. (JA 587-588). Sheppard also testified that Armstrong had an "unidentified white atomizer bottle that looked like glass" that could have been used as a weapon if Armstrong had tried to hit them with it. (JA 464). While Sheppard acknowledged that Armstrong did not verbally threaten her, she noted that, "I have worked with schizophrenics; they can change from one second to the next second. You don't know what they're going to do." (JA463).[3]

### 3.    Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

Appellant does not dispute that Armstrong was resisting, but claims his resistance was not "aggressive, threatening, or hostile." (Appellant's Brief, p. 14). However, it is abundantly clear from the record that Armstrong was actively and aggressively resisting the Officers' attempts to take him into custody. Everyone, including Lopez, testified that Armstrong resisted from the time he grabbed the post until he was handcuffed. (JA 240, 323, 349, 515, 555). In fact, Plaintiff's own

---

[3] In fact, Armstrong did have a history of violence, including sexually assaulting his daughter, choking his wife, pointing a gun at his wife and telling her that he would kill her if she left him, and tearing up a kitchen countertop in front of his wife and children. (JA 363-389). Armstrong also cut his chest open in front of his wife because he wanted her to see that she had "broke[n] his heart." (JA 388). Armstrong's wife and children fled from him in 2005, and purposefully did not let Armstrong know where they were. (JA 390).

expert testified that Armstrong's resistance was a form of active resistance. (JA 656).

Lopez herself described Armstrong as "struggling" with the officers, and stated that Armstrong was "resisting with them." (JA 224). During the struggle, Lopez continuously pleaded with Armstrong to "stop fighting" with the officers. (JA 231). Lopez testified that Armstrong was exerting himself and was determined not to let go of the post. (JA 229). Lopez testified that Armstrong was "resisting the police officers" just prior to the taser being deployed. (JA 228-229). After the officers were finally able to get Armstrong off the post, Lopez admitted that Armstrong continued "forcefully resisting," and was actively trying to keep the Officers from putting handcuffs on him. (JA 234-235). Lopez had to put her own foot on Armstrong to get him to comply while the officers attempted to place handcuffs on him. (JA 233).

The Officers testified that Armstrong's resistance required them to engage in a physical struggle and that his conduct constituted active or aggressive resistance. Sheppard described Armstrong's resistance as "active aggression" and testified that Armstrong was "fighting against us" and "resisting with all of his force and life that he had." (JA 496-499). McDonald described Armstrong as "fighting" and "actively and aggressively resisting." (JA 563). He testified that Armstrong

became violent, and that he kicked at the Officers while they tried to put the shackles on his legs. (JA 573). Gatling testified there was "active resistance and a physical struggle" before the taser was used, and that, "when we've got a subject that's actively resisting three officers out there, I'd consider that pretty extreme. If it's going to take three of us to get him under control and we still can't get him into custody, then we have to use force necessary to gain control of him." (JA 441).

Hospital Security Guards Verbal and Blankenship also testified that Armstrong was actively resisting. Blankenship testified that Armstrong was "fighting" and "struggling" against the Officers. (JA 330, 336). Both Blankenship and Verbal testified that it appeared Armstrong actually knocked the taser out of Gatling's hand at one point. (JA 305-307, 321-322, 330-331).

Appellant's contention that there are issues of fact "about whether Armstrong was passively resisting or actively/aggressively resisting" is simply unsupported by any evidence in the record, as the witness testimony, including Plaintiff's own testimony, makes clear that Armstrong was actively resisting the officers.

**B.    The Officers' use of force was reasonable under the circumstances.**

In Appellant's brief, it is argued that, "there were other, demonstrably more reasonable levels of force that could and should have been applied under these

- 29 -

circumstances." (Appellant's Brief, p. 16). However, Appellant fails to identify even one of these "demonstrably more reasonable levels of force."

### 1. The officers were under no obligation to continue attempting to verbally persuade Armstrong to come with them voluntarily.

Appellant concedes, as she must, that the Officers "were not constitutionally limited to attempting to verbally persuade Armstrong." (Appellant's Brief, p. 16). Appellant further concedes that attempts to verbally persuade Armstrong were not working, as "the situation did not change" after ten minutes of the Officers trying to verbally persuade Armstrong to come to the hospital with them. *Id.* Despite these concessions, Appellant asserts that the Officers "should have taken more time to persuade Armstrong." (Appellants Brief, pp. 20-21).[4]

Although the Officers were required to take Armstrong into custody once they received the commitment papers (*See* N.C. Gen. Stat. § 122C-263), they did in fact continue trying to convince Armstrong to come with them voluntarily after receiving the commitment papers. (JA 541). Sheppard testified that, "we were pleading with him to let go of the pole. Let go, please let go of the pole." (JA 485). McDonald testified that, "I verbally told him please release, please take your hands off the pole, you know, we got to go to the hospital." (JA 542). Verbal testified

---

[4] In support of this, Appellant cites to a number of pages in the Joint Appendix, none of which appear to have any relation to this argument.

that, "they kept pleading with—pleading with Mr. Armstrong to let go of the pole, let go of the pole." (JA 302). Armstrong would not comply, and was telling the Officers that he was not going back to the hospital, despite the commitment order. (JA 301, 349, 450). Appellant's conclusory assertion that the Officers should have talked to Armstrong for a longer period of time is exactly the type of armchair analysis which Courts have rejected when analyzing a § 1983 excessive force claim. *See e.g., Sigman*, 161 F.3d at 786-87.

> **2.    The officers were entitled to use physical force in their efforts to take Armstrong into custody.**

There can be no dispute that the Officers were entitled to use physical force to pry Armstrong from the post. N.C. Gen. Stat. § 122C-251(e) authorizes an officer to use reasonable force where necessary when transporting someone pursuant to an involuntary commitment order. Further, courts have ruled that where an officer reasonably perceives resistance, force can be used. This is so even where the plaintiff claims that he was not resisting, and where less force could have been used. *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002). While plaintiff is critical that McDonald put a knee in Armstrong's back to handcuff him, the placement of a knee on the back (even between the shoulder blades) is not enough to create an issue of fact regarding excessive force in light of Armstrong's resistance. In *Bell v. Dawson*, 144 F. Supp. 2d 454, 463 (W.D.N.C. 2001), the

Court granted summary judgment in the defendants' favor despite the plaintiff's claim that an officer kneed him in the back resulting in an injury. *Id.* at 458. In *Bell*, the Court held that officers are not "constitutionally required to delay gaining control of the Plaintiff and to continue to argue with him as he struggled to wrest himself away from them." *Id.* Here, no evidence exists of any trauma to Armstrong's back, lungs, or chest caused by alleged exertion of pressure on his back. *Cf. Abdullahi v. Madison*, 423 F.3d 763, 771 (7th Cir. 2005), where the plaintiff presented evidence that the decedent's lung was collapsed and his chest cavity was crushed by the weight and pressure placed on him. *Id.*

The same is true regarding the fact the Armstrong was briefly left in a prone position after being handcuffed while the Officers briefly stood over him, caught their breath, and made sure everyone was okay. This very situation was rejected as a basis for a constitutional claim in *Phillips v. Milwaukee*, 123 F.3d 586 (7th Cir. 1997), where the plaintiff argued that the decedent was left handcuffed in the prone position for several minutes and subsequently died of asphyxia. In its Opinion, the Court states: "Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *Id.* at 593. The Court notes that the decedent was in the prone position for "only a few minutes"

and that the officers (like the Officers in this case) stayed with him the entire time and never left him unattended. *Id.* at 594.

### 3. The officers were entitled to use a taser in order to take Armstrong into custody.

Plaintiff's expert, Mel Tucker, conceded that officers are allowed to use non-lethal force, including a taser, to overcome the resistance of an individual who resists officers attempting to get them to comply with an involuntary commitment order, as Armstrong was in this case. (JA 649-650). Tucker testified as follows:

Q:   Would you agree that officers are allowed to use a nonlethal force when faced with—with resistance to lawful orders?

A:   Am I—the question is am I—do I—can an officer use force to overcome the resistance of somebody that they have lawful authority—yes, they certainly can.

Q:   And that would include the use of a taser, correct?

A:   That's correct.

…

Q:   Is a—is an officer—in North Carolina is an officer—if an officer orders an individual to come with them pursuant to involuntary commitment orders, is that a vol—is that a lawful order by a police officers?

A:   It's an involuntary commitment order, yes.

…

- 33 -

Q:    And you would agree that Mr. Armstrong was resisting when the taser was used, correct?

A:    Yes.

Q:    And you would agree that he continued to resist after the taser was put away, correct?

A:    Yes

…

Q:    And you would agree that he did refuse their—their lawful orders to come with them, correct?

A:    Yes.

(JA 649, 655).

Tucker agreed that studies have shown that tasers are effective and, when used appropriately, decrease injuries. (JA 639-640). Plaintiff's expert agreed that the taser is not considered deadly force, and that the Officers did not *intend* to use deadly force during the incident. (JA 638).

Further, the Fourth Circuit has held that multiple uses of a taser when a suspect is actively resisting is not unreasonable or excessive. *See e.g.*, *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 733 (4th Cir. 2013) (holding that first three deployments of taser did not amount to an unreasonable or excessive use of force given that plaintiff posed an immediate threat to the officers' safety, and was actively resisting arrest, but denying qualified immunity to deployments of taser

- 34 -

after plaintiff was subdued). Likewise, in *Thomas v. Holly*, 533 Fed. Appx. 208 (4th Cir. 2013), the Court examined each application of a taser and ruled that two of three defendant deputies were entitled to summary judgment. As to the first deputy, who tased the plaintiff three times, the Court noted that at all relevant times the plaintiff "defied Deputy Mathews' commands to remain on the ground." *Id.* at 216-217. The Court ruled that the second deputy, who tased the plaintiff three times, was also protected by qualified immunity because the plaintiff was not yet restrained at the time. *Id.* at 217. The Court denied summary judgment to the third deputy who tased the plaintiff four times "after he was effectively secured." *Id.* at 218. In this case, Armstrong actively resisted until he was handcuffed. It is undisputed that no one used force on Armstrong after he was handcuffed. (JA 323).

In addition, it is undisputed that the Officers' use of the taser was not enough force to overcome Armstrong's resistance. (JA 232, 302, 424-425, 482, 550). "Under the common law, a law enforcement officer has the right, in making an arrest and securing control of an offender, to use only such force as may be reasonably necessary to overcome any resistance and properly discharge his duties." *Myrick v. Cooley*, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (1988). The fact that the multiple uses of the taser was not sufficient force to overcome

plaintiff's resistance undercuts Appellant's argument that it was excessive under the circumstances.

Further, Plaintiff's assertion that the officers "leaped from an attempt to pull and pry Armstrong from his position to use of a dangerous electro-shock weapon,[5] taking no intermediate or less drastic steps in between"[6] is belied by the record evidence. As set forth in the statement of facts, the officers used graduated levels of force before using a taser.

At her deposition, Lopez conceded the following:

Q:    And they had—before they—before they used the taser, they had been telling him to let go and you had been telling him to let go of the pole?

A:    Yes, sir.

Q:    So they had been giving verbal commands and he just wasn't responding to that?

A:    Yes, sir.

Q:    He refused to go along with what they asked or what you asked?

A:    Yes, sir.

Q:    Is that right?

---

[5] A taser, which Plaintiff's expert conceded can be an extremely effective, less-than-lethal, force option available to officers, and an option that he is "very supportive" of as a law enforcement tool. (JA 637-638).

[6] Appellant's Brief, p. 15.

A:      Yes, sir.

Q:      And then they tried to use their hands just to pry him off of the pole, to pull him off the pole; is that right?

A:      Yes, sir.

Q:      And he was still resisting and still clinging onto that pole; is that right?

A:      Yes, sir.

(JA 238).

### 4.      The officers were not required to treat Armstrong any differently due to his mental condition.

Plaintiff asserts that the Officers should have treated Armstrong differently because he was mentally ill. It is clear from the record that the officers did in fact, show restraint and kindness to Armstrong in their efforts to convince him to come with them to the hospital. (JA 224, 225, 302, 485, 508, 542). Nevertheless, officers are allowed to use force in the involuntary commitment setting. N.C. Gen. Stat. § 122C-251(e) authorizes the use of force. Section 122C-251(e) provides further that "no law enforcement officer may be held . . . civilly liable . . . on account of reasonable measures taken under the authority of this Order." While the mental status of the plaintiff is a factor, courts analyze force in the commitment setting in the same manner as in other settings. *See Bailey v. Kennedy*, 349 F.3d 731, 743-

744 (4th Cir. 2003). Appellant's contention that the officers did not show caution and calm is belied by the record.

Further, Appellant cites to a number of cases that stand for the proposition that a severe injury inflicted by the police can be evidence of excessive force. However, in this case, there were several witnesses to the events, including Plaintiff, who testified to exactly what level of force was used. In *Witt v. West Virginia State Police*, 633 F.3d 272, 276 (4th Cir. 2011), the Court notes that the presence of witness testimony is a factor in the qualified immunity analysis. As there is no dispute as to the level of force actually used by the officers in this case, these cases are inapposite.

Based on the above, the Officers' use of force was objectively reasonable as a matter of law.

**III. EVEN IF APPELLANT COULD ESTABLISH THAT ARMSTRONG'S CONSTITUTIONAL RIGHTS WERE VIOLATED, THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY, AS THOSE RIGHTS WERE NOT CLEARLY ESTABLISHED AT THE TIME.**

Even assuming arguendo that Appellant could establish that Armstrong's constitutional rights were violated, the officers are entitled to qualified immunity as that right was not clearly established on 23 April 2011. Gatling's use of the taser was under circumstances where he had a duty to transport Armstrong to the

hospital, and Armstrong was actively—both physically and verbally—resisting the officers' efforts to place him in handcuffs. An officer in Gatling's position would not have been aware that he was violating a *clearly established right* when he tased Armstrong (including multiple times), especially given that courts have since approved multiple uses of the taser on suspects who are actively resisting. In *Bailey v. Kennedy*, 349 F.3d 731, 741, the Court states: "In deciding whether the right alleged to have been violated was clearly established, we must define the right 'at a high level of particularity.'" *Id.* at 741 (citations omitted). Plaintiff has identified no such right in this case.

In cases which have been decided since the use of force in this case, courts have recognized that the law regarding tasers is still evolving. In *Russell v. Wright*, 916 F. Supp. 2d 629, 643 (W.D. Va. 2013), the court discusses the lack of judicial guidance regarding tasers, particularly in the Fourth Circuit:

> "The relative novelty of tasers and their sudden rise in use among police forces, and the benefits and potential harms they offer law enforcement / agencies and the public, raise particularly difficult questions for courts tasked with weighing claims of excessive force stemming from their use. This is especially true in light of the wide array of factual scenarios that are inherent in police work, and the requirement to evaluate excessive force claims through a totality of the circumstances approach. The Supreme Court of the United States has not issued a decision substantively evaluating the use of tasers in an excessive force claim, nor does the law of this circuit offer many helpful examples.

…

Looking to other circuits for persuasive authority, the clearest articulation of a rule for when the use of a taser is appropriate is found in *Hagans v. Franklin County Sheriff's Office,* 695 F.3d 505 (6th Cir. 2012). In evaluating the issue under a qualified immunity analysis, the Court drew the line at: "[when] a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Id.* at 509. The Court briefly explains numerous cases that illustrate the distinction between active resistance and compliance with officers' demands. *Id.* at 509–10. In each of these cases, use of a taser was deemed appropriate when suspects refused to comply with officers commands, and inappropriate where the suspects were complying or were attempting to comply.

…

Given the dearth of case law on the use of tasers in excessive force cases, particularly within the Fourth Circuit, the court simply cannot say that Wright's use of the taser under these circumstances violated clearly established law.  Tasers are still relatively novel devices, and courts across the country continue to grapple with determining their proper role in assisting law enforcement officers."

*Id.* at pp. 637-638, 643.  The court held that, "reviewing the relevant caselaw that does exist, the court believes that the line between active resistance and compliance is helpful in evaluating whether Wright's behavior was objectively reasonable." Given the evidence in that case that the plaintiff was actively resisting and refusing to obey commands, the Court found that the officer was entitled to qualified immunity.

- 40 -

In a similar case, *Estate of Awkward v. Willingboro Police Dep't*, Civ. Action No. 07-5083, 2010 WL 3906785 (D.N.J. 2010), Tyrone Awkward died when police officers attempted to take him into custody pursuant to an involuntary commitment order. As the officers attempted to handcuff and restrain the individual, he was shouting "I can't breathe, I can't breathe." *Id.* at *2. During the majority of the struggle, the officers stated that the Awkward was attempting to push-up off the ground by arching his back, as well as flailing his legs and rolling around, continuously resisting the officers' attempt to control him. *Id.* at *3. "Once Tyrone was under control and handcuffed, still face down, Sergeant McKendrick asked Tyrone if he was okay, called his name, and tapped him on the back but received no answer. The five officers flipped him onto his back at the instruction of Sargent McKendrick. At this point, Officer Bucs observed that Tyrone's eyes looked 'glassy.' They all realized that he was unconscious." *Id.* During subsequent transport to the hospital, Awkward died from positional asphyxia. *Id.* The entire struggle lasted less than ten minutes. *Id.*

The Court held as follows:

"First, several of the *Graham* factors are satisfied. Tyrone had been deemed by Hansen to be "dangerous to self [or] other[s]," he was subsequently deemed to be dangerous due to the dangling handcuffs, which could be used as a weapon, and he was actively resisting being involuntarily committed and trying to flee. Additionally, the entire encounter from the attempted handcuffing to Tyrone's compliance was

less than ten minutes. These factors weigh in favor of the officers' decision to use some force to control Tyrone.

Second, even if the officers heard Tyrone's repeated yells that he could not breathe, once they finally secured the handcuffs, they undisputedly alighted from touching any part of his body. Ostensibly it was Tyrone's unconsciousness from the lack of air that caused him to cease resisting, rather than his volitional decision to become compliant, but the officers were not aware of Tyrone's condition at that point. Instead, once they secured Tyrone's hands, they discontinued any use of force. This is consistent with *Bornstad* and *Drummond.*

Third, it is undisputed that the officers were unaware of, and they did not receive any training on, positional asphyxia. Although the Third Circuit, quoting *Drummond,* recognized that a police officer would not need training to know that "squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable," a police officer unaware of the positional asphyxia phenomenon, combined with the need to restrain a violently resisting individual, is a different consideration. *Bornstad,* 211 Fed. Appx. at 124. Furthermore, although the intent of the officers is irrelevant to the excessive force analysis, the unknown consequences of certain positioning while attempting to control a resisting individual is much different from the volitional force commonly associated with excessive force cases, such as kicking, punching, and shooting.

Consequently, based on all these considerations in light of the situation as presented by plaintiffs, the officers acted objectively reasonably, despite the tragic outcome."

*Id.* at *11.

The cases cited by Appellant to support his contention that the right was

clearly established are inapposite. Plaintiff relies heavily on *Bailey v. Kennedy*, 349

- 42 -

F.3d 731 (4th Cir. 2003). In that case, the court denied qualified immunity on the

following facts:

> "Here, Michael was unarmed, and the use of force continued even
> after he was secured with flex-cuffs around both his hands and his
> feet, and lying face down on the floor, alone in a room of his parents'
> house. Kennedy lifted Michael up by his arms while they were bound
> behind his back, thereby wrenching his shoulder, and Whitley kicked
> Michael in the back when he cried out in pain. Thus, Kennedy and
> Whitley violated clearly established law in using force to seize
> Michael when he had committed no crime and when they had no
> reason to believe he was a danger to himself or others. It was
> especially clear that they were not entitled to use force after Michael
> was secured face down on the floor in handcuffs and leg restraints."

*Id.* at 745 (4th Cir. 2003). In contrast to *Bailey*, it is undisputed in the present case

that the officers had legal authority (indeed, a legal duty) to seize Armstrong

(Appellant's Brief, p. 12, JA 675), had legal authority to use reasonable force

necessary to take Armstrong into custody (Appellant's Brief, p. 16, N.C. Gen. Stat.

§ 122C-251(e)), and did not use any force on Armstrong after he was handcuffed.

(JA 323). As such, the facts in *Bailey* are entirely distinguishable from the present

case.

Appellant also relies on *Myers v. Balt. County*, 713 F.3d 723 (4th Cir. 2013),

a case decided *after* the use of force occurred in this matter. In that case, an

arrestee was tasered a total of ten times—three before he was secured, and seven

more times after he was unarmed and secured. The court concluded that the first

three deployments of the taser did not amount to an unreasonable or excessive use of force, given that the subject was acting erratically, holding a baseball that he did not relinquish until after the second shock, and was advancing towards the officers until the third shock caused him to fall to the ground. The court recognized that, "Under these circumstances, Ryan posed an immediate threat to the officers' safety, and was actively resisting arrest." *Id.* at 733. However, the court found the next seven taser shocks were "unnecessary, gratuitous, and disproportionate," given that "Ryan was unarmed and effectively was secured with several officers sitting on his back." *Id.* at 734. Accordingly the court held that, "because Ryan did not pose a threat to the officers' safety and was not actively resisting arrest, a reasonable officer in Officer Mee's position would have understood that his delivery of some, if not all, of the seven additional taser shocks violated Ryan's Fourth Amendment right to be free from the use of excessive and unreasonable force. Accordingly, we hold that the district court erred in concluding that Officer Mee met his burden of proving that he was entitled to qualified immunity." *Id.* In contrast, there is no dispute in the present case that Armstrong resisted from the time he grabbed the post until he was handcuffed, both before and after the taser deployments. (JA 240, 323, 349, 515, 555). Further, there is no dispute that no force was used on Armstrong after he was handcuffed. (JA 323). As such, *Myers*

actually supports Appellee's contention that the use of the taser was reasonable under the circumstances.

## IV. TO THE EXTENT APPELLANT HAS NOT WAIVED CLAIMS FOR MUNICIPAL LIABILITY UNDER § 1983, THE DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT AS TO THOSE CLAIMS.

In order to prevail in her municipal constitutional claim against Pinehurst and its officials, it is not enough for plaintiff to establish that the Officers engaged in excessive force.[7] *Respondeat superior* does not apply to § 1983 claims. *Wellington v. Daniels*, 717 F.2d 932, 935 (4th Cir. 1983). Plaintiff must prove that the alleged unconstitutional conduct resulted from an official policy or custom or, alternatively, deliberate indifference by the municipality and its officials in the training and supervision of its employees. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Regarding alleged official policies, plaintiff must prove that the alleged unconstitutional conduct was *caused* by an *unconstitutional* official policy or custom. *Spell v. McDaniel,* 824 F.2d 1380, 1385-1386 (4th Cir. 1987). Where an alleged failure to train is at issue, deliberate indifference must be shown. *Wellington*, 717 F.2d at 936. Knowledge and liability will be imputed to a

---

[7] Official capacity claims are essentially the same as a claim against the entity and are duplicative when the employing municipal or governmental entity is also named as a defendant in the case. *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004).

supervisor or official so as to impose liability for supervisory liability "only in those situations in which there is a history of widespread abuse." *Id.* Single or isolated incidents are not enough. *Id.*

In this case, Appellant has presented no evidence of an unconstitutional policy or custom involving excessive force, widespread abuse, or deliberate indifference in training. Pinehurst has had only seven incidents of force since 2007 (not including the Armstrong incident). (JA 182, ¶ 11). Tasers were used in only four of these incidents. (JA 182, ¶ 12). Force was involved in only four of the 456 mental calls from 2006 until the date of Armstrong's incident. Tasers were used in only two of these mental health calls. (JA 182, ¶¶ 11-13). No incident involving force, excluding Armstrong's incident, resulted in claims or significant injuries. (JA 182, ¶ 12).

It is undisputed that the Officers complied with all State and Departmental mandated training at all relevant times. (JA 182, ¶ 4). It is further undisputed that the Department's training met or exceeded all training requirements of the State, including all use of force training. (JA 182, ¶¶ 5-8). The fact that the Officers did not certify yearly on tasers does not create an issue of fact as to deliberately indifferent conduct. The State does not require yearly certification. (JA 182, ¶ 4). Yearly certification is a *recommendation* by taser manufacturer TASER

INTERNATIONAL Inc., not a *requirement* of the State. TASER INTERNATIONAL, Inc. acknowledges in its written materials that it cannot set standards or training requirements. (JA 577-578, 583-585, 595). TASER INTERNATIONAL, Inc. does not take any action to insure that officers certify yearly. It does not restrict the use of its tasers only to officers who certify yearly. (JA 596-597, 583-585).

Based on the evidence that the Police Department complied with or exceeded all state training requirements and the lack of evidence of widespread abuse, plaintiff's federal municipal claim for failure to train were properly dismissed.

## <u>CONCLUSION</u>

For the reasons set forth herein, defendants-appellees respectfully request that Judge Catherine C. Eagles' Order granting summary judgment in defendants' favor be affirmed and that all claims herein be dismissed.

This the 26th day of June, 2015.

CRANFILL, SUMNER & HARTZOG, LLP

/s/ Dan M. Hartzog, Jr.
DAN M. HARTZOG
dmh@cshlaw.com
DAN M. HARTZOG, JR.
N.C. State Bar No. 35330
E-mail: dhartzogjr@cshlaw.com
CRANFILL SUMNER & HARTZOG LLP
Post Office Box 27808
Raleigh, North Carolina 27611-7808
Telephone: 919-828-5100

MICHAEL J. NEWMAN
VAN CAMP, MEACHAM
 & NEWMAN PLLC
Post Office Box 1389
Pinehurst, North Carolina 28370
E-mail: michaeln@vancamplaw.com
Telephone: 910-295-2525

*Counsel for Defendants-Appellees*

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

     this brief contains <u>11,137</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

     This brief has been prepared in proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated:  June 26, 2015                    <u>/s/ Dan M. Hartzog, Jr.</u>
                                         Dan M. Hartzog, Jr.

                                         *Counsel for Appellees*

- 49 -

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on June 26, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Karen R. Taylor
Karen R. Taylor
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219